**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| RALPH RAYMOND BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-804 |
| | ) | |
| KIA MOTORS CORPORATION and KIA | ) | Judge Terrence F. McVerry |
| MOTORS AMERICA, INC., | ) | Magistrate Judge Cathy Bissoon |
| | ) | |
| Defendants. | ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### I.     RECOMMENDATION

It is respectfully recommended that Defendants' Motion for Summary Judgment

(Doc. 18) be granted in part and denied in part, as discussed below.

### II.     REPORT

**BACKGROUND**

#### A.     **Factual Background**

Plaintiff, Ralph Raymond Brown, commenced this product liability action to recover for

injuries he sustained in a motor vehicle crash on May 27, 2004. See generally Compl. (Doc. 1,

Ex. A).   Plaintiff has brought his action against the manufacturer of his motor vehicle, Kia

Motors Corporation and against Kia Motors America, Inc. (collectively, "Kia" or "Defendants").

Id.

On May 27, 2004, Plaintiff was driving his 2000 Kia Sportage from his home to a store

on Route 340 in Page County, Virginia.  (Compl. ¶ 4; Defs.' Concise Statement of Material Facts

(Doc. 120) ("Defs.' Facts") at ¶ 1; Pl's Brief in Opposition to Defs' Motion for Summary

Judgment (Doc. 124) ("Pl's Opp. Br.") at 3-4.)  On route from his home, Plaintiff drove off the

road and his vehicle rolled over one-and-three quarters revolutions while he remained in it. (Defs.' Facts at ¶¶ 3-4.)  Plaintiff was ejected from the vehicle during the crash and suffered severe injuries from the crash.  Id. at ¶ 5.

**Seatbelt Design**

Plaintiff's vehicle, a Kia Sportage, contains a three-point seatbelt.  (Defs.' Motion for Summary Judgment (Doc. 118) at ¶ 13.)  One point of the seatbelt mounts to the floor, one point mounts to the frame of the vehicle and the final point of the seatbelt is at the buckle.  Id.  The seatbelt also has an "energy management loop" – a loop of webbing protected by the scabbard, which is designed to deploy additional webbing when a certain amount of force is applied.  Id. at ¶ 14.  The seatbelt also has a "web grabber" – a hammer and anvil device that "helps to prevent too much seatbelt webbing from spooling off of the retractor in a crash."  Id. at ¶ 15.  Another component of the seatbelt is a latchplate stop button – a small plastic button that prevents the "seatbelt's latchplate from dropping to the ground when the seatbelt is in a stowed position."  Id. at ¶ 16.  Finally, the driver's front seat is adjusted using a seat recliner lever.  Id. at ¶ 17.

**Plaintiff's Seatbelt After The Crash**

After the crash, it was observed that Plaintiff's seatbelt was completely severed in a part of the seatbelt webbing at a point that was approximately 10 inches from the lap belt anchor point where the seatbelt is anchored to the floor.  Id. at ¶ 6.  The seatbelt also was partially severed in a part of the seatbelt webbing that was approximately 92 inches from where the seatbelt is anchored to the floor.  Id. at ¶ 7.  The energy management loop on the seatbelt was not deployed.  Id. at ¶ 8.  Scratches were discovered on the outboard side of the scabbard covering the energy management loop.  Id. at ¶ 9.  The latchplate stop button was not damaged or removed from the seatbelt.  Id. at ¶ 11.

## B.    Procedural Background

Plaintiff filed his Complaint in the Court of Common Pleas of Allegheny County on May 24, 2006.  In his Complaint, Plaintiff asserts three causes of action:  (1) Strict Liability (Count I); (2) Negligence and Recklessness (Count II); and (3) Breach of Implied Warranty (Count III).  (Doc. 1, Ex. A.)  Plaintiff alleges that the seatbelt and the seat restraint system is defective.  It is alleged that the seat restraint system was designed in a manner that allowed the seatbelt to become routed underneath the seatback recliner lever and then become torn and severed by the sharp edge of the lever by forces reasonably anticipated in a vehicle collision.  In support of his allegations, Plaintiff proffers, inter alia, the expert testimony of five witnesses: (1) Stephen Batzer; (2) Russell F. Dunn; (3) David Renfroe; (4) Mariusz Ziejewski; and (5) Richard A. Clarke.

On June 16, 2006, Defendants removed Plaintiff's action to this Court on the basis of diversity jurisdiction.  (Doc. 1.)  On November 7, 2006, Defendants sought to transfer venue from the Western District of Pennsylvania to the United States District Court for the Eastern District of Virginia, primarily on the grounds that Virginia was the site of the accident, as well as the location of the pertinent evidence and witnesses.  (Doc. 27.)  On January 17, 2007, the Honorable Magistrate Judge Francis X. Caiazza issued a Report and Recommendation in which he recommended that Defendants' Motion to Transfer Venue be denied.  (Doc. 42.)  On February 15, 2007, the Honorable Terrence F. McVerry adopted the Report and Recommendation and denied Defendants' Motion to Transfer Venue, thereby retaining the case in this jurisdiction.  (Doc. 57.)

Defendants now move for summary judgment, asserting that there are no genuine issues of material fact as to Plaintiff's claims.  Defendants premise their Motion on the admissibility of certain of Plaintiff's experts, specifically Drs. Batzer, Dunn, and Renfroe.  Defendants argue that

the testimony of these experts is not reliable and, therefore, inadmissible under Federal Rule of Evidence 702.  According to Defendants, if these experts are precluded from offering their opinions, Plaintiff cannot proffer any evidence of a defect and, therefore, cannot sustain his claims.  Pursuant to this Court's Order of January 8, 2009, the parties submitted supplemental briefing on Defendants' Motion for Summary Judgment.  This case is now ripe for disposition.

## ANALYSIS

### A.        THE *DAUBERT* INQUIRY

#### 1.        *Legal Standards for Admissibility of Expert Evidence*

Federal Rule of Evidence 702 governs the admissibility of expert evidence or testimony and provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

Rule 702 has three major requirements:  "(1) the proffered witness must be an expert, i.e., must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact."  Pineda v. Ford Motor Co., 520 F.3d 237, 244 (3d Cir. 2008) (citing In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741-42 (3d Cir. 1994)).  The second of these three requirements mandates that the expert's "process or technique" – i.e., the expert's methodology – be reliable.  Id.  Rule 702 has a

"liberal policy of admissibility." Id. (quoting Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 806 (3d Cir. 1997)).[1]

Under the familiar Daubert framework, the trial judge acts as a "gatekeeper" to ensure that "'any and all expert testimony or evidence is not only relevant, but also reliable.'" Id. (quoting Kannankeril, 128 F.3d at 806). "'[A]n expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable.'" Id. (quoting Paoli, 35 F.3d at 742). Thus, the focus of the reliability inquiry is on the *methodology* used by the expert, not the conclusions drawn by the expert. Id. A number of factors can be analyzed to assess the reliability of the methodology used by the expert (and, ultimately, admissibility of the expert's testimony), including, but not limited to:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

Id. at 248. These factors are not exhaustive and each of them may not be applicable in every case. Id. The inquiry under Rule 702 (and Daubert) is intended to be a flexible one. Id.

The Court now will turn to addressing the admissibility of each of the challenged experts.

### 2. Stephen Batzer

The first of the three experts at issue is Dr. Stephen Batzer, a mechanical engineer with expertise in material selection in design, failure analysis, manufacturing, and automobile structural integrity. (Pl. App., Ex. 18 (Doc. 124) ("Batzer Report") at 1.) Dr. Batzer has a Ph.D

---

[1] Defendants' challenge is only as to the second requirement concerning reliability. Therefore, the Court assumes, without deciding, that each of the experts is qualified and that each of their opinions – if reliable – will assist the trier of fact.

in Mechanical Engineering and works for The Engineering Institute.  Id.  Plaintiff offers

Dr. Batzer to opine that "the outermost portions of the fabric (toward the two edges) show

fraying/tensile failure, while the inner portion shows cutting, with characteristic sheared

bundles."  Id.  Stated simply, as to the severed portion of the seatbelt webbing at 10 inches,

Dr. Batzer opines that the outer portion of the seatbelt is torn and the inner portion of it is cut.

Id.  Defendants assert that this opinion is unreliable because it is not based on a reliable

methodology.  The Court disagrees.

Defendants argue that Dr. Batzer's methodology merely involved "look[ing] at the

seatbelt, look[ing] at the vehicle, look[ing] at the seatbelt under a scanning electron microscope

("SEM") and then determin[ing] that part of it looked cut and part of it looked torn."  (Defs.'

Memorandum of Law in Support of Motion for Summary Judgment ("Defs.' Br.") at 11.)  A

careful review of the record reveals that Dr. Batzer's methodology is more than sufficiently

reliable.  Dr. Batzer's methodology involved a vehicle inspection, a visual examination of the

severed seatbelt webbing, a scanning electron microscope ("SEM") survey and analysis, a review

of the technical literature, and discussions with other materials scientists.  (Pl's App., Ex. 27

(Doc. 124) & Defs. App., Ex. 8 (Doc. 118) (collectively, "Batzer Dep.") at 7-8, 17-20.)

Dr. Batzer's visual inspection suggested to him that the center of the belt was cut and the outer

portions were pulled.  Id.  Dr. Batzer then performed an SEM analysis wherein he took various

microscopic images of the subject seatbelt and various other end forms.  Id.  He compared those

images with those found in the peer-reviewed technical literature, including the Atlas of Fibre

Fracture and Damage to Textiles, a publication by The Textile Institute and the Department of

Textiles at the University of Manchester Institute of Science, and Textiles and Automotive

Engineering.  Id.

The Court finds that the methodology that Dr. Batzer used to arrive at his conclusions concerning whether (and what portions) of the seatbelt webbing were cut or torn is reliable. Contrary to Defendants' assertions, Dr. Batzer performed a visual and microscopic analysis of the webbing, consistent with the technical literature upon which he relied. Dr. Batzer's opinion, therefore, is admissible under Federal Rule of Evidence 702. The Court recommends that Defendants' Motion to Exclude Dr. Batzer's testimony be denied.

### 3. *Russell F. Dunn*

The second expert at issue is Dr. Russell F. Dunn, a Chemical Engineer with a Ph.D in Chemical Engineering. (Pl's App., Ex. 19 (Doc. 124) ("Dunn Report") at 1.) Plaintiff offers Dr. Dunn to opine that, as to the severed portion of the seatbelt at 10 inches, 60% of the fully severed portion of the seatbelt was cut by the sharp metal edge on the seatback recliner lever and that the remaining 40% of it was torn under load. (Id.; see also Pl's App., Ex. 20 (Doc. 124) ("Dunn Supp. Report").) More specifically, Dr. Dunn opines that: (1) at the 10 inch mark, "approximately 60% of the belt webbing fibers were severed by cutting and 40% were torn under load" by the seat back recliner lever; (2) "[t]he cut portion of the subject seat belt webbing . . . substantially diminished its residual strength"; and (3) at the 92 inch mark of the seatbelt, "approximately 37% of the webbing is torn." (Dunn Report at 1.)

Defendants challenge the reliability of these opinions on the ground that Dr. Dunn allegedly conducted his analysis in a vacuum and "simply examined the seatbelt, both with his naked eyes and with a microscope." (Defs.' Br. at 9.) Defendants emphasize that Dr. Dunn lacked knowledge as to the type of crash, Plaintiff's movements during the crash, or the amount of force applied to the seatbelt during the crash. Id. Plaintiff asserts that Dr. Dunn's methodology involved "performing a stereomicroscope study of the cut and torn segments of the webbing and by comparing its configuration with that of the sharp sheet metal edge of the seat

back recliner lever and then by further analysis of the SEM photographs." (Pl's Opp. Br. at 31.) The Court finds that Dr. Dunn's methodology passes muster under the Daubert analysis.

Dr. Dunn's opinion that part of the webbing was severed by cutting and 40% tore under load is premised on a microscopic and visual examination, including an SEM analysis. This methodology also is the basis for Dr. Dunn's opinion that 37% of the webbing is torn at the 92 inch mark. As discussed above, the process of using microscopic and visual analysis of cut and/or torn webbing to assess whether the webbing is cut or torn (and the extent of such cutting or tearing) is reliable in the context of failure analysis. See supra.

Dr. Dunn's opinion that the cut portion of the webbing was cut by the seatback recliner lever also is based on a reliable methodology, which consisted of, among other things, standard failure analysis protocol. (See generally Dunn Report, Dunn Supp. Report; see also Pl. App., Ex. 28 (Doc. 124) ("January 2008 Dunn Dep.") at 56.) Dr. Dunn first performed a visual examination of the subject seatbelt and an exemplar seatbelt and noted that "the seat belt webbing cut pattern is consistent with the shape formed by the metal edge of seat back tilt lever." (Dunn Report at 7.) Dr. Dunn additionally studied SEM photographs of the exemplar and the subject seatbelt webbing that was cut using four different tools (pocket knife, shears, scissors, and a razor knife) to essentially rule out those tools as the cutting object. (See generally Dunn Supp. Report.) He studied the fiber ends and observed that "all four cutting tools produced relatively straight contour of fiber ends with little to no fraying," while "[i]n contrast, the subject seat belt webbing has jagged contours of cut fibers with relatively straight clusters of fiber ends." Id. Moreover, he observed, "the pattern of the cut section in the subject seat belt webbing is consistent with the pattern of the seat back tilt lever." Id. In further support of his conclusion that the metal edge of the seat back recliner lever was the object that cut the seatbelt, Dr. Dunn

cited the publication <u>Atlas of Fibre Fracture and Damage to Textiles</u> for an example of "fibers under load cut across sheet metal that exhibit fused fiber ends." (Dunn Supp. Report at 7; <u>see also</u> January 2008 Dunn Dep. at 51-53.) Dr. Dunn's methodology to arrive at his opinion that the seatbelt webbing was cut by the lever, which essentially consists of a process of elimination, is sufficiently reliable under <u>Daubert</u>. <u>See</u> <u>Rudd v. General Motors Corp.,</u> 127 F. Supp. 2d 1330, 1343 (M.D. Ala. 2001) (stating that the expert's "method for settling on a cause for the fatigue-fracture through a process of eliminating alternative possible causes is, by a preponderance of the evidence, a reliable one. Inference chains built upon such circumstantial evidence are a well-established feature of admissible expert testimony."). Although Defendants argue that Dr. Dunn's testimony is unreliable because he skipped steps in this protocol, this does not render his opinion unreliable. <u>See</u> <u>Martinez v. Triad Controls, Inc.,</u> --- F. Supp.2d ---, 2009 WL 57018, at *4 (E.D. Pa. Jan. 6, 2009) ("[E]ven if the Court believes . . . that there are some flaws in an expert's methods, the testimony should be admitted if there are 'good grounds' for it.) (citing <u>Heller v. Shaw Indus., Inc.,</u> 167 F.3d 146, 152-53 (3d Cir. 1999)).

Dr. Dunn's opinion on the reduced residual strength of the seatbelt is based on polymer fiber manufacturing and testing experience. (Dunn Report at 12.) Specifically, Dr. Dunn analyzed the SEM photographs documenting the tensile failure and observed that the "approximately 60% of the fibers oriented in the axial direction of the subject seat belt have been cut." <u>Id.</u> He also noted the principle that the "strength of the seat belt webbing is linear versus the amount of tensile strength that an intact seat belt web can withstand before failure" and that "[s]eat belt webbing tensile strength is typically reduced at a level greater than a linear relationship." <u>Id.</u> From these scientifically rooted observations, Dr. Dunn concluded that residual belt strength was 40% or less. <u>Id.</u> Although Defendants argue that Dr. Dunn did not

perform any tensile strength testing, Dr. Dunn's opinion is a product of not only well-rooted scientific principles and literature concerning the strength of polymers, but also his past experience, which included prior testing on tensile strength. (January 2008 Dunn Dep. at 34-36.) This, the Court finds, is sufficient to render Dr. Dunn's opinion reliable. See Giorgini v. Ford Motor Co., No. 06-0968, 2008 WL 859230, at *12 (E.D. Pa. Mar. 28, 2008) (suggesting that lack of testing is not fatal and stating that "[f]ailure on the part of an expert to test a theory might be remedied under Daubert by submitting evidence of another expert's study, literature in that expert's field that supports the expert's conclusion, or evidence that theory has been generally accepted and adopted by his particular investigative community"). The Court finds that, given the liberal standards of admissibility under Daubert, Dr. Dunn's opinion concerning the reduced tensile strength of the seatbelt is sufficiently reliable to be reliable under Rule 702.

A final argument as to the reliability of Dr. Dunn's opinion bears mentioning. Defendants argue that "there is no proof that [Plaintiff's] body could have ripped the uncut 40% [of the seatbelt] apart." (Defs.' Br. at 7.) They assert that Plaintiff's experts, including Dr. Dunn, relied on "backward reasoning," having tested the amount of force it takes to deploy the energy management loop, instead of the amount of force necessary to tear the seatbelt (which Defendants' expert purportedly tested). Id. The Court finds that Defendants' challenge as to the "reasoning" (backward or otherwise) that Dr. Dunn (or any of the experts) applied as to this issue is more appropriately addressed on cross-examination insofar as it evidences a difference of opinion among experts. See Martinez, 2009 WL 57018, at *8 (concluding that expert's testimony was reliable and that "any issues that [defendant] has with . . . [the expert's] failure to make certain measurements or calculations would be more properly addressed on the merits,

such as through cross-examination or through [defendant's] own expert witness, rather than by excluding [the expert] as a witness").

For these same reasons, Defendants' challenge based on the facts Dr. Dunn did not know, i.e., the type of crash, Plaintiff's movements during the crash, or the amount of force applied to the seatbelt during the crash, all are classic subjects of cross-examination and go to the weight that a fact-finder should place on his opinions, not the reliability or admissibility of those opinions under Daubert.

For all of the above reasons, the Court concludes that Dr. Dunn's proposed testimony is reliable and accordingly, admissible, under Federal Rule of Evidence 702. It is, therefore, recommended that Defendants' Motion to Exclude Dr. Dunn's testimony be denied.

### 4.    *David Renfroe*

The final expert at issue is David Renfroe, an expert in automobile vehicle dynamics, accident reconstruction, occupant motion kinematics, and other vehicle design issues. (Pl. App., Exs. 21-22.) Dr. Renfroe obtained his Ph.D. in mechanical engineering in 1981. For over 20 years, he has analyzed vehicle dynamics in accident situations. Id. His experience in analyzing vehicle dynamics and designing and testing off road vehicles "has required an extensive knowledge of vehicle dynamics, application of these principles, and testing the resulting machine for compliance with the design objectives." (Id., Ex. 22 at 2.) A review of Dr. Renfroe's qualifications reveals that he has extensive experience with design and design-related issues.

Plaintiff offers Dr. Renfroe to provide the following conclusions: (1) Plaintiff was wearing his seatbelt at the time of the accident; (2) the design of the seat restraint system, specifically the seat recliner handle, is defective and unreasonably dangerous; (3) the defective and unreasonably dangerous condition caused Plaintiff's injuries; and (4) there are alternative, safer designs. (Pl's App., Ex. 21 (Doc. 124) ("March 2007 Renfroe Report") at 6; see also Pl's

App., Ex. 22 (Doc. 124) ("July 2007 Renfroe Report").)  In a nutshell, Plaintiff offers

Dr. Renfroe to opine that the seatbelt was defective and unreasonably dangerous.  The essence of

Dr. Renfroe's defect opinion is as follows:

> An analysis of the design and placement of the actuation handle on
> the seat back tilt mechanism demonstrates that it is reasonably
> foreseeable that the driver's seat belt webbing could become
> entrapped under the actuation handle in normal usage, thereby
> presenting an unreasonable risk of webbing severance in a
> reasonably foreseeable accident.

March 2007 Renfroe Report at 5.  During his deposition, Dr. Renfroe explained that the seat

recliner handle is defective "because of its placement, and that it's possible to loop the seat

recline[r] handle under it, and because it has a sharp edge on it."  (Pl's App., Ex. 30 ("Renfroe

Dep.") at 43.)  In his report, Dr. Renfroe ties the conclusions drawn by Drs. Batzer and Dunn

together with his own, explaining that "the most likely cause of this partially torn and partially

cut severance pattern [on the seatbelt at 10 inches] was entrapment of the webbing under the

sharp curved edge on the actuation handle on the seat back tilt mechanism."  (March 2007

Renfroe Report at 4.)

In reaching his conclusions, Dr. Renfroe reviewed and analyzed a series of materials,

including the expert reports of Drs. Batzer, Dunn, and Ziejewski, as well as the report of

Mr. Clarke.  Dr. Renfroe also reviewed the accident report; a number of photographs taken of the

vehicle at issue; photographic studies conducted by Clarke Automotive Consultants; SEM

photographs of torn and cut webbing; an alternative design study; exemplar seat studies

conducted on a 1997 and 2000 model Kia Sportage and a 1988 Ford Festiva; a surrogate study;

the accident reconstruction report; photographs of the retractor and webbing grabber from the

joint seat belt removal; consumer complaints regarding seat belt interaction with the seat back

recliner lever filed with the National Highway and Traffic Safety Administration ("NHTSA");

and various documents pertaining to a previous action in which Kia was involved, captioned

Fadok v. Kia Motors Corporation, et al.  (March 2007 Renfroe Report; July 2007 Renfroe

Report.)  Although the admissibility of Dr. Renfroe's testimony presents a somewhat closer

question, the Court finds that, under the liberal standards of admissibility set forth in Daubert and

its progeny, Dr. Renfroe's conclusions are reliable and, accordingly, admissible under Rule 702.

Dr. Renfroe's opinion on defectiveness has several reliable bases or components.[2]  To

reiterate, the sum of Dr. Renfroe's opinion is that a defect exists because the seatbelt can become

routed beneath the seat back recliner lever, which, in turn, creates a situation in which the lever

can cut the seatbelt.  Dr. Renfroe's opinion as to the manner in which the seatbelt was cut and

torn (i.e., by the seat back recliner handle) is reliable for the same reasons discussed above in

connection with the reliability of Dr. Dunn's opinion.  See supra.

Dr. Renfroe additionally provided reliable support for his opinion by citing to peer-

reviewed technical literature, namely a technical paper published by the Society of Automotive

Engineers entitled "Diagnosis of Seat Belt Usage in Accidents."  (Pl. App., Ex. 31 (Doc. 124).)

The paper discusses the proper methodology for analyzing "cut or broken webbing" and

confirms that the methodology of using a combination of visual and microscopic examination is

legitimate and reliable.  (Pl. App., Ex. 31 (Doc. 124).)  The technical paper provides that "[w]hen

---

[2]       Before turning to Dr. Renfroe's opinion on defectiveness, Dr. Renfroe's opinion that Plaintiff was wearing his seatbelt is noteworthy.  The Court observes that Defendants do not seem to challenge this aspect of Dr. Renfroe's opinion in any meaningful way.  Regardless, Dr. Renfroe's opinion in this regard is based on a reliable methodology which included, inter alia, observations of the seatbelt and the location of the damage to that belt.  (Renfroe Dep. at 16-22.)  Based on the location of the damage and his opinions as to the cause of that damage, Dr. Renfroe opined that Plaintiff was wearing his seatbelt.  Id.  Dr. Renfroe, in his expert report, also cited to the deposition testimony of both Plaintiff and Ms. Cyndi Brown.  (Renfroe Report at 6.)  Plaintiff testified that he recalled putting his seatbelt on when he left his home the day of the accident (Pl. App., Ex. 2 at 64, 67-68) and the testimony of Cyndi Brown corroborates Plaintiff's recollection.  (Pl. App., Ex. 3 at 22.)  Finally, Dr. Mariusz Ziejewski, another in the stable of Plaintiff's experts, also opines that Plaintiff was wearing his seatbelt.  (Pl. App., Ex. 17 (Doc. 124) at 3.)  The Court notes that, for purposes of Defendants' Motion for Summary Judgment discussed in more detail infra, Plaintiff has proffered both expert testimony and circumstantial evidence from which a fact-finder can infer that Plaintiff had his seatbelt on at the time of the accident.

seatbelt webbing is loaded to destruction and when it is cut, it obtains characteristics which are easily identifiable to the naked eye." Id. This publication further provides that "[i]ntentionally cut webbing has a characteristic appearance. Cutting the webbing with a knife or shears results in uniform cuts with many of the fibers separated at exactly the same length." Id. Notably, the publication demonstrates that an examination of the location of the cut – an aspect of both Dr. Dunn and Dr. Renfroe's methodologies – "can be used to determine the cutting structure simply from its position in the vehicle." Id. Finally, the technical paper addresses instances where "the separated end of nylon webbing [is] totally severed due to loading across a piece of deformed metal during a collision." Id. As this illustrates, the methodology employed by Dr. Renfroe (and, for that matter, by Drs. Batzer and Dunn) to arrive at the conclusion that the seatbelt was cut by the seat back recliner lever is reliable and will assist a trier of fact.

Additionally, in light of the above, Defendants' argument that Dr. Renfroe's theory purportedly is untested, and therefore unreliable, is weak. See Giorgini, 2008 WL 859230, at *12 (noting that a failure to test may be remedied by submitting evidence of "literature in that expert's field that supports the expert's conclusions"); see also Cicolello v. Caterpillar, Inc., No. 06-3327, 2008 WL 183737, at *2-3 (E.D. Pa. Jan. 18, 2008) ("We appreciate that the adequacy of testing is a significant issue in this case but determine that it is an issue for the trier of fact. We thus conclude that, when considered in relation to the full scope of [the expert's] conclusions and his reasons in support, the questions with respect to the adequacy of the testing do not lead us to exclude his testimony. . ."); see also Clay v. Ford Motor Co., 215 F.3d 663, 668 (6th Cir. 2000) (affirming decision to allow expert testimony and noting that "[t]he district court, in its discretion, could have decided that [the expert's] failure to test his theories went to the weight of his testimony regarding defects in the [vehicle], not to its admissibility.").

As to Dr. Renfroe's opinion that the seatbelt can become routed under the seat back recliner lever, Dr. Renfroe's methodology involved a study of an exemplar vehicle. He testified that he has observed the possibility of this occurring by "manipulating it [himself] in an exemplar [i.e., a comparable 1997 Kia Sportage] vehicle." (Renfroe Dep. at 31.) To the extent that Dr. Renfroe essentially has "tested" this or observed this through his own study of an exemplar vehicle, Dr. Renfroe's opinion is reliable on this point. See Totty v. Chubb Corp., No. 05-111, 2007 WL 141058, at *4-5 (W.D. Pa. Jan. 17, 2007) (Ambrose, C.J.) (finding as reliable a structural engineer expert's opinion based on visual observations and a review of reports and evaluations prepared concerning the cause and/or extent of damage to the house; court concluded that "the visual inspection methodology [the expert] applied to reach [his] conclusion is reliable and helpful to the trier of fact").

Another portion of Dr. Renfroe's defect opinion is that "it is reasonably foreseeable that the driver's seat belt webbing could become entrapped under the actuation handle in normal usage, thereby presenting an unreasonable risk of webbing severance in a reasonably foreseeable accident." (July 2007 Renfroe Report at 5.) To formulate this opinion, Dr. Renfroe first noted that a visual examination of the seat and its relation to the seatbelt anchor point shows that "webbing could easily become entrapped under the seat back recliner lever." Id. at 3. Dr. Renfroe additionally reviewed complaints filed with the National Highway and Transportation Safety Administration ("NHTSA") and a product liability action in which Kia previously was involved. (Pl. App., Exs. 7, 8 (Doc. 124).) The prior action was filed in 2001 in the Superior Court of the State of Arizona in Maricopa County and was captioned Fadok v. Kia Motors Corporation, et al. (Pl. App., Ex.8.) According to Dr. Renfroe, the NHTSA complaints

and the Fadok case further illustrate that a seatbelt can become caught under the seat back recliner lever.

Dr. Renfroe's reliance on the NHTSA complaints is problematic insofar as the NHTSA complaints did not involve Kia vehicles, let alone a 2000 model Kia Sportage like the one at issue in this case. Additionally, the Court notes that it has not been presented with the actual NHTSA complaints such that it may be determined whether the incidents at issue in those complaints are comparable to the instant case. On the other hand, the Fadok case may provide a sound basis for Dr. Renfroe's opinion. The Fadok matter involved a 1997 Kia Sportage – a vehicle that is substantially similar to the 2000 Kia Sportage here. (Pl. App., Ex. 7 (Doc. 124).) As is the case here, the Fadok case involved a rollover collision in which the driver was ejected. Id. In Fadok, the plaintiff alleged that the defect in the vehicle involved, among other things, the seatbelt getting routed beneath the seat back recliner lever. Id. Although the Fadok case did not involve the seatbelt becoming severed as a result, it provides a sufficiently reliable basis for Dr. Renfroe's opinion that the seatbelt can get caught underneath the seatback recliner lever.

Dr. Renfroe's opinion regarding alternative designs also is reliable insofar as it is based on a survey of alternative designs in other vehicles. Defendants challenge Dr. Renfroe's opinion on grounds that he did not "personally evaluate[] and test[]" any of the alternative designs listed in his expert report. (Defs.' Br. at 14-17.) But, as with the Court's discussion of testing generally, the testing of alternative designs is not dispositive of whether an expert's opinion is reliable. See Pineda, 520 F.3d at 248 (reversing trial court's decision to exclude expert testimony and noting that expert "did not have to develop or test alternative warnings to render an opinion" pertaining to the effectiveness of the manufacturer's warnings); see also Ahner v. Black Bros. Co., Inc., No. 06-1523, 2008 WL 2880382, at *2 (W.D. Pa. May 11, 2008)

(Lancaster, J.) (finding expert opinion on defect reliable and finding as unpersuasive argument that expert's opinion was unreliable because alternative designs were neither identified nor tested, stating that the "Court of Appeals has made clear . . . that the district court should not focus 'too narrowly' on an expert's failure either to offer proposed alternatives or to test the effectiveness of those alternatives").

Defendants also challenge the reliability of Dr. Renfroe's opinion regarding the second cut or tear at the 92 inch mark on the basis that it is untested. (Defs.' Br. at 8-9.) First, as discussed above, Dr. Dunn opined that the webbing is torn, as opposed to cut, at the 92 inch mark. The Court already has determined that this opinion is reliable. See supra. Dr. Renfroe built upon both Dr. Dunn and Mr. Clarke's analyses to conclude that the tear was caused by the webbing grabber. In his July 2007 Report, Dr. Renfroe explained that "Mr. Clarke's subsequent surrogate study . . . showed that the location of this tear was consistent with the location of the webbing grabber . . . ." (July 2007 Renfroe Report at 3.) He further explained that "[a]n examination of the webbing grabber in the subject retractor shows that the clamping plate is attached to the pivot arm on one side by a screw and on the other side by a location pin. The subject tear is located on the side of the clamping plate corresponding to the location of pint where the greatest shearing stress would be expected." Id. During his deposition, Dr. Renfroe additionally explained his methodology and testified that a misalignment in the webbing grabber mechanism can lead to uneven loading which, in turn, can lead to tearing. (Renfroe Dep. at 49-53.) The Court finds that Dr. Renfroe's methodology for assessing the tear at 92 inches is no different than the methodology employed to assess the cut at 10 inches, namely an examination of the location of the tear vis-à-vis the potential mechanisms at the location that could cause the webbing to tear. The Court finds that Dr. Renfore's methodology is reliable. Although

Defendants argue that Dr. Renfroe lacked any evidence that the mechanism loaded unevenly, the Court finds that this deficiency is better addressed through cross-examination at trial.[3]

In sum, Dr. Renfroe's opinion has a number of reliable bases, including the SEM analysis of the webbing, a surrogate study of an exemplar vehicle in which he was involved, and a review of the materials from the <u>Fadok</u> matter. The various bases for Dr. Renfroe's opinion discussed above, along with his extensive experience, is sufficient to render reliable Dr. Renfroe's opinion that the seat recliner handle is defective and unreasonably dangerous. <u>See</u> <u>Fillebrown v. Steelcase, Inc.</u>, 63 Fed. Appx. 54, 56-57 (3d Cir. Feb. 24, 2003) (finding as reliable an expert opinion that a defect in a chair – a fatigue failure from a machining mark – caused chair to fracture; court observed that the expert's metallurgy and materials failure analysis was "reasoned and the product of a reliable methodology"); <u>Babcock & Wilcox Ebensburg, Power, Inc. v. Zurich Am. Ins. Co.</u>, No. 02-299, 2005 WL 6068838, at *9 (W.D. Pa. Sept. 8, 2005) (Gibson, J.) (finding expert testimony reliable under <u>Daubert</u> where expert offered opinion on the cause of a rotor failure; court observed that individual "is an expert in metallurgy and materials failure. His work experience involved an extensive number of failure analyses. His investigation included observation of the rotor, examination of photographs, and certain tests involving samples of the rotor. He set forth scientific principles upon which he relied and then applied those principles to observed facts, and from those principles and facts he made a conclusion concerning [the cause of the rotor failure].").[4]

---

[3]     Additionally, the Court observes that Dr. Mariusz Ziejewski, another of Plaintiff's experts, also opines that, based on his analysis, "there is no other reasonable explanation for th[e] partial tear [at 92 inches] other than it having been caused by actuation of the webbing grabber." (Pl. App., Ex. 17 (Doc. 124) at 3.) Defendants have not sought to preclude Dr. Ziejewski from offering his expert opinions and those opinions are not at issue in this Motion. Thus, even if Dr. Renfroe's opinion were unreliable on this point, Plaintiff has proffered evidence of the cause of the partial tear at 92 inches.

[4]     In support of their admissibility arguments (particularly that Plaintiff's experts are unreliable because they purportedly did not conduct any testing), Defendants rely on the Third Circuit's decision in <u>Oddi v. Ford Motor Co.</u>, 234 F.3d 136 (3d Cir. 2000). There, the Court found that the expert's methodology consisted of

For all of the above reasons, the Court concludes that Dr. Renfroe's proposed testimony is reliable and accordingly, admissible, under Federal Rule of Evidence 702. The Court recommends that Defendants' Motion to Exclude Dr. Renfroe's testimony be denied.

**B.      DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Having determined the admissibility of Plaintiff's experts, the Court now turns to whether summary judgment is appropriate. Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

### *1.      Which State's Substantive Law Applies*

A preliminary issue raised by the parties is whether Pennsylvania or Virginia law applies. Defendants assert that Virginia law applies, while Plaintiff asks for the application of Pennsylvania law. The Court agrees with Defendants that Virginia's substantive law applies.

A federal court sitting in diversity must apply the choice of law rules of the forum state to determine which state's law applies to the substantive issues before it. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941). As this action is brought in the United States District Court for the Western District of Pennsylvania, Pennsylvania's choice of law rules apply.

To determine which state's law to apply, Pennsylvania courts conduct a two-prong inquiry. First, courts determine whether a false conflict exists between the laws of the

---

nothing more than "intuition" and observed that plaintiff could not establish the "existence of [the expert's] methodology and research let alone the adequacy of it." Id. at 156-58. As demonstrated above, however, Plaintiff's experts have used far more than their intuition and Plaintiff has been able to demonstrate their methodologies and the peer-reviewed publications giving credence to those methodologies and to their opinions. While in some instances Plaintiff's experts may have drawn from their experiences as engineers (which the Court believes is acceptable, in some measure, under Daubert), they also have utilized reliable processes, i.e., SEM analysis and surrogate studies, to arrive at their conclusions.

jurisdictions at issue.  See LeJeune v. Bliss-Salem, Inc., 85 F.3d 1069, 1071 (3d Cir. 1996).  A false conflict exists where "'only one jurisdiction's governmental interests would be impaired by the application of the other jurisdiction's laws.'"  Id. (quoting Lacey v. Cessna Aircraft Co., 932 F.2d 170, 187 & n.15 (3d Cir. 1991)).  Although Plaintiff asserts that a false conflict exists, the Court observes that Plaintiff also concedes that the laws of Pennsylvania and Virginia differ as to his strict liability and breach of warranty claims.  (Pl's Opp. at 43-44.)  In addition, as Defendants note, common law negligence differs between Pennsylvania and Virginia insofar as Virginia recognizes contributory negligence, while Pennsylvania adheres to a comparative negligence scheme.  (See Defs.' Reply Brief (Doc. 125) at 12.)  The Court finds that there is no false conflict.

Where, as here, no false conflict exists, the analysis turns to which state's law to apply.  For this inquiry, Pennsylvania courts utilize what is commonly referred to as the "most significant relationship" test, which focuses on the policies and interests underlying the case.  See Griffith v. United Air Lines, Inc., 203 A.2d 796, 805-06 (Pa. 1964).  When applying this test, "'it must be remembered that a mere counting of contacts is not what is involved.  The weight of a particular state's contacts must be measured on a qualitative rather than quantitative scale.'"  LeJeune, 85 F.3d at 1072 (quoting Cipolla v. Shaposka, 267 A.2d 854 (Pa. 1970)).  Under the "most significant relationship" test, which is set forth in the Restatement (Second) of Conflict of Laws, the following factors are considered:

> (a) the place where the injury occurred;
>
> (b) the place where the conduct causing the injury occurred;
>
> (c) the domicil[e], residence, nationality, place of incorporation and place of business of the parties, and
>
> (d) the place where the relationship, if any, between the parties centered.

Restatement (Second) of Conflict of Laws § 145(2).  Section 146 provides further guidance:

> In an action for a personal injury, **the local law of the state where the injury occurred determines the rights and liabilities of the parties**, unless, with respect to the particular issue, some other state has a more significant relationship . . . in which even the local law of the other state will be applied.

Id. § 146 (emphasis added).

An analysis of the above factors and the contacts of the parties leads to the conclusion that Virginia has the most significant relationship to the issues involved in this case and the greater interest in seeing its laws applied.  First, the accident and injury occurred in Virginia at a time when Plaintiff was a resident of Virginia.  Although the location of the injury is not dispositive, "[w]here the site of an accident is not fortuitous, 'the place of injury assumes much greater importance, and in some instances may be determinative.'"  LeJeune, 85 F.3d at 1072 (quoting Shields v. Consolidated Rail Corp., 810 F.2d 397, 401 (3d Cir. 1987)).  The Third Circuit's decision in Lejeune is instructive on this point.  There, the Court observed that the accident had occurred in Delaware, along with much of the allegedly negligent conduct.  Id. at 1072.  The only contact that Pennsylvania had was that the plaintiff was a Pennsylvania resident. Id.  The Court held that Delaware law applied.  Id.  As the Court observed:  "Delaware's contacts with the accident relate to substantive aspects of the case such as how and why certain conduct occurred.  Pennsylvania's contact arises not from substantive matters in the litigation but rather from [plaintiff's] residence."  Id.  Here, although Plaintiff moved to Pennsylvania after the accident, a mere change in residence after the conduct giving rise to the cause of action is not sufficient to establish that Pennsylvania law should apply.  See Phillips v. General Motors Corp., No. 87-7097, 1988 WL 30971, at *3 (E.D. Pa. Mar. 29, 1988) (declining to apply Pennsylvania law and noting that "purely nominal residence in a state – standing alone – is not a contact sufficient to sustain application of that state's law, . . . and a postoccurrence change of residence

to the forum state – again standing alone – is similarly insufficient to sustain application of the law of the forum") (citations omitted).

In addition to the fact that the accident and injury occurred in Virginia, Plaintiff purchased his vehicle in Virginia. (Defs.' Ex. 12 (Doc. 119) at 2.) Therefore, the relationship between the parties was formed and centered in Virginia. Finally, after the accident, Plaintiff was treated in a Virginia hospital by doctors licensed to practice medicine in Virginia. Id. These facts additionally support the application of Virginia law. See Phillips, 1988 WL 30971, at *3 (applying Pennsylvania law in a product liability case because "[t]he plaintiff resided in Pennsylvania before the accident and resides there now, the defendant does business in Pennsylvania, and the plaintiff purchased the vehicle that is the subject of the suit in Pennsylvania").

### 2. Strict Liability Claim: Count I

In Count I of his Complaint, Plaintiff asserts a claim for strict liability. It is well-established that Virginia has not adopted Section 402A of the Restatement (Second) of Torts and, therefore, a plaintiff cannot assert a claim for strict product liability. Sensenbrenner v. Rust, Orling & Neale Architects, Inc., 374 S.E.2d 55, 57 n.4 (Va.1998) ("Virginia law has not adopted § 402A of the Restatement (Second) of Torts and does not permit tort recovery on a strict-liability theory in products-liability cases."); see also Wolford v. Budd Co., 149 F.R.D. 127, 131 (W.D. Va. 1993) (dismissing strict liability claim because "Virginia does not allow recovery on the basis of any theory of strict tort liability"). As a result, Plaintiff's claim for strict liability fails as a matter of law and the Court recommends that Count I of Plaintiff's Complaint be dismissed with prejudice.

### 3.        Negligence/Recklessness and Breach of Implied Warranty Claims: Counts II and III

In Counts II and III, Plaintiff alleges counts for both negligence and breach of implied warranty.  Under Virginia law, "under either a negligence or a breach of implied warranty theory for the manufacture of an unreasonably dangerous product, a plaintiff must show (1) that the goods were unreasonably dangerous either for the use to which they would ordinarily be put or for some other reasonably foreseeable purpose, and (2) that the unreasonably dangerous condition existed when the goods left the manufacturer's hands."  Morgen Indus., Inc. v. Vaughan, 471 S.E.2d 489, 492 (Va. 1996).  A product is "unreasonably dangerous" if it is "defective in assembly, or manufacture, [or] unreasonably dangerous in design . . . ."  Id. Therefore, a plaintiff must establish the existence of a defect.  A plaintiff cannot establish a manufacturer's negligence or the existence of a defect simply by pointing to the fact that an accident occurred.  Logan v. Montgomery Ward & Co., Inc., 219 S.E.2d 685, 687 (Va. 1975) ("The mere fact of an explosion does not establish the negligence of either the manufacturer or seller of the stove, and does not establish that the stove was defective.").  Finally, the "issue whether a product is unreasonably dangerous is a question of fact."  Morgen Indus., Inc., 471 S.E.2d at 492.

Turning to the present case, the Court first observes that Plaintiff cannot establish his negligence and warranty claims simply by asserting that the seatbelt was severed and, therefore, must have been defective.  Logan, 219 S.E.2d at 687.  As such, Plaintiff must have evidence – expert or otherwise – to establish the existence of an "unreasonably dangerous" condition.  That is, Plaintiff must present evidence that the seatbelt, or the seat restraint system, in his vehicle was defective.  As discussed above, Plaintiff alleges that the seat restraint system was defective because there is a possibility for the seatbelt to become routed beneath the seat recliner lever,

which has a sharp edge that can sever the seatbelt.  In support of this theory, Plaintiff has proffered, among other evidence, the expert testimony of Drs. Batzer, Dunn and Renfroe.  In addition to the testimony of these experts, Plaintiff also has proffered the testimony of two additional experts who are not at issue in this Motion, namely Mr. Richard A. Clarke and Dr. Mariusz Ziejewski.  Mr. Clarke, <u>inter alia</u>, conducted the initial inspection on the vehicle; conducted a joint inspection of the vehicle with one of Defendants' expert witnesses, John Hinger; and conducted an alternative design survey.  (Pl. App., Exs. 14, 16, 25 (Doc. 124).) Dr. Ziejewski opined that (1) Plaintiff was wearing his seatbelt; (2) Plaintiff's injuries were as a result of him being ejected from the vehicle; and (3) Plaintiff's injuries would not have been as severe if he had not been ejected.  (Pl. App., Exs. 17, 26 (Doc. 124).)

Based on the Court's analysis above, Plaintiff's experts, collectively, have proffered sufficient evidence to raise an issue of fact as to whether the seatbelt and seat back recliner lever were unreasonably dangerous and defective.  This includes, but is not limited to, evidence that Plaintiff was wearing his seatbelt; that the seatbelt was caught beneath the seat recliner lever; that, at the point where the seatbelt was completely severed, the outer portion of the seatbelt was torn and the inner portion was cut; and that, at the point where the seatbelt was completely severed, 60% of the seatbelt was cut by the seat recliner handle and 40% of it was torn under load.  In addition, there is evidence that alternative designs existed in which the seat recliner handle was recessed such that the seatbelt could not become routed beneath it.  In particular, Plaintiff has proffered evidence of an alternative design survey conducted by Richard A. Clarke and Clarke Automotive Consultants, which involved a survey of eleven different vehicles in a variety of model years from 1993 through 2000.  (Pl. App., Exs. 14, 16 (Doc. 124).)

In sum, the Court finds that Plaintiff's proffer of evidence is sufficient to raise material issues of fact as to Plaintiff's negligence and warranty claims under Virginia law. For these reasons, the Court recommends that Defendants' motion for summary judgment be denied in these respects.[5]

---

[5] Defendants also seek judgment on Plaintiff's claim for punitive damages, asserting that Plaintiff cannot maintain a claim for punitive damages. (Defs. Br. at 17-20.) Defendants argue that Korean law applies to Plaintiff's claims and because Korean law does not recognize punitive damages, Plaintiff cannot maintain a claim for such damages. Id. The Court disagrees that Korean law applies to Plaintiff's claim for punitive damages. To begin, under Federal Rule of Civil Procedure 44.1, which governs determinations of foreign law in federal court, a party seeking the application of foreign law carries "both the burden of raising the issue that foreign law may apply in an action, and the burden of adequately providing foreign law to enable the court to apply it in a particular case." Bel-Ray Co., Inc. v. Chemrite (Pty) Ltd., 181 F.3d 435, 440 (3d Cir. 1999). Here, although Defendants may have met their burden of raising the issue, they have not met their burden of "adequately providing foreign law" to allow this Court to apply it. In support, Defendants only provide the declaration of a South Korean lawyer, who merely asserts, without citation to any authority (legal or otherwise), that "Korean law does not recognize and has never recognized punitive damages," From this lone assertion, it is impossible for the Court to engage meaningfully in an assessment of whether Korean law applies. Id. (applying the law of the forum, in part, because the party did not provide "any evidence to prove the substance of [South African contract] law"). Second, even under a choice-of-law analysis, the Court finds that Korean law does not apply. Applying the factors discussed above, all but one factor weighs in favor of applying the law of some jurisdiction other than Korea. As discussed above in the previous choice-of-law analysis, Plaintiff's injury occurred in Virginia; Plaintiff presently resides in Pennsylvania and, at the time of the accident, resided in Virginia; Plaintiff purchased the vehicle at issue in Virginia; and Kia Motors Corporation is a California corporation and markets Kia vehicles all over the United States. The only factor potentially weighing in favor of applying Korean law is the factor concerning the place of conduct. According to Defendants, the only conduct at issue is the designing of the Kia Sportage at issue in this case, which they assert occurred in Korea, not the United States, while Plaintiff asserts that the conduct at issue goes beyond design and manufacture to Defendants' marketing and distribution of Kia vehicles in the United States with the alleged knowledge of a defect. The Court finds, on balance, that Pennsylvania law (or even Virginia law) governs the Plaintiff's claim for punitive damages, not Korean law. See Kukoly v. World Factory, Inc., No. 07-1644, 2007 WL 1816476, at *3 (E.D. Pa. June 22, 2007) (finding that Pennsylvania law applied on punitive damages claim because it had the "most qualitative and significant contacts" insofar as the "allegedly defective product was sold in Pennsylvania and the injury occurred in Pennsylvania. Plaintiffs are domiciled in Pennsylvania, [one defendant] conducts business in Pennsylvania, and [the other defendant] places products into the stream of commerce where it is reasonably foreseeable its products will end up in Pennsylvania"). Moreover, policy considerations counsel in favor of not applying Korean law insofar as either Virginia or Pennsylvania have an interest in ensuring that its citizens are not sold, or otherwise subjected to, defectively designed or manufactured products. See In re Korean Airline Disaster of Sept. 1, 1983, 932 F.2d 1475, 1499 (D.C. Cir. 1991) (Mikva, C.J., dissenting) ("Even assuming that Korea made a conscious decision to protect home businesses from excessive judgments, an interest it deemed more important than the added increment of deterrence from punitive damages, such a trade-off for purposes of internal Korean law does not mean that other interested jurisdictions cannot choose to apply punitive damages if they have a countervailing interest in punishment and deterrence that is involved in the controversy. In this case, the United States has an interest in both punishing egregious conduct that begins in this country and deterring its future recurrence. The United States' interest in deterring willful misconduct . . . might well outweigh Korea's more parochial interest in protecting home businesses.")

## CONCLUSION

In conclusion, the Court recommends that Defendants' Motion to Exclude the Expert Testimony of Drs. Stephen Batzer, Russell F. Dunn and David Renfroe (Doc. 18) be denied. The Court additionally recommends that Defendants' Motion for Summary Judgment (Doc. 18) be granted in part and denied in part. Specifically, the Court recommends that Defendants' Motion for Summary Judgment be granted as to Count I of Plaintiff's Complaint for strict liability and that Count I be dismissed with prejudice. The Court recommends that because genuine issues of material fact exist as to Counts II and III of Plaintiff's Complaint for negligence/recklessness and breach of warranty, respectively, as well as to Plaintiff's request for punitive damages, Defendants' Motion for Summary Judgment be denied as to Counts II and III of Plaintiff's Complaint and as to Plaintiff's claim for punitive damages.

In accordance with the Magistrates Act, 20 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrates, objections to this Report and Recommendation are due by March 16, 2009. Responses to objections are due by March 30, 2009.

---

For all of the above reasons, the Court finds that Korean law does not apply on the issue of punitive damages. The Court refers the parties to its choice of law analysis above concerning Plaintiff's substantive claims and notes that the parties have not briefed the issue of whether Virginia law might apply to the punitive damages issue, as they had with regard to Plaintiff's substantive claims. Both parties have addressed only the choice between Korean law and Pennsylvania law (i.e., the law of the forum). But, for purposes of Defendants' Motion, the Court need not resolve the conflict, if any, between Pennsylvania and Virginia on this issue because a litigant in either jurisdiction may recover punitive damages. Regardless of whether Pennsylvania or Virginia law applies, the Court concludes that there are genuine issues of material fact in dispute on the issue of punitive damages. For this reason, Defendants' motion as to Plaintiff's claim for punitive damages is denied.

s/ Cathy Bissoon
Cathy Bissoon
U.S. Magistrate Judge

February 27, 2009

cc (via email):

Mark F. Conboy, Esq.
J. Kendall Few, Esq.
Michael Layman Ritchie, Esq.
Roger A. Ritchie, Esq.
Christopher C. Spencer, Esq.
Clem C. Trischler, Esq.
Elizabeth A. Kinland, Esq.
Scott W. Monson, Esq.