## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

RALPH RAYMOND BROWN                )
                                   )
                    Plaintiff,     )
                                   )
          v.                       )          02: 06-cv-0804
                                   )
                                   )
KIA MOTORS CORPORATION and         )
KIA MOTORS AMERICA, INC.,          )
                                   )
                    Defendants.    )

### MEMORANDUM OPINION AND ORDER

Presently before the Court is the DEFENDANTS' MOTION FOR SANCTIONS,

with briefs in support, filed by KIA Motors Corporation and KIA Motors America, Inc. (Document

Nos. 286, 287, 288, and 293), the AFFIDAVIT OF J. KENDALL FEW, PLAINTIFF'S  ANSWER

BRIEF IN OPPOSITION and RESPONSE TO DEFENDANT'S MOTION FOR SANCTIONS filed

on behalf of Respondent, J. Kendall Few[1] (Document Nos. 296, 297 and 298), and the REPLY

BRIEF filed by KIA Motors Corporation and KIA Motors America, Inc. (Document No. 304).

After a careful and deliberate consideration of the motion, the filings in support and

opposition thereto, the memoranda of the parties, the numerous Affidavits filed in support and

opposition of the motion, the record as a whole, and the relevant case law, the Motion will be

denied.

---

[1]     The Court notes that the Answer and Response were improperly filed in the name of
the Plaintiff, Ralph Raymond Brown, who is not the real party in interest in this
sanctions motion  proceeding.  Furthermore, William R. Caroselli has entered his
appearance "on behalf of Plaintiff, Ralph Raymond Brown."  However, Attorney
Caroselli does not represent Plaintiff, Ralph Raymond Brown, but rather his attorney, J.
Kendall Few. Defendants seek relief only against lead trial counsel for Plaintiff, J.
Kendall Few.

**Background of Case**

As the Court is writing for the parties, it is not necessary to go into great detail about the facts of the underlying lawsuit.  However, the Court will briefly describe the background facts that are relevant to the instant motion.

This lawsuit commenced on May 24, 2006, with the filing of a Complaint in the Court of Common Pleas of Allegheny County, Pennsylvania, on behalf of Plaintiff, Ralph Raymond Brown. Plaintiff alleged that he suffered paralyzing injuries when he was ejected from his 2000 Kia Sportage automobile, after he failed to navigate a turn, went off the road, drove into an embankment and overturned.  On June 16, 2006, Defendant Kia Motors America ("KMA") removed the case to this Court.  On September 8, 2006, Defendant Kia Motors Corporation ("KMC") consented to the removal.  Almost from the initiation of the lawsuit, the attorneys were very contentious in their dealings with each other and aggressive in their respective representation of their clients.  For example, the parties filed over ten (10) pretrial motions with regard to various discovery issues and fifteen (15) motions in limine.[2]  From the outset, it was basically uncontested that no one had actual knowledge of what caused the seat belt in this case to become torn, severed, or come apart.

Plaintiff's theory of the case was that the seat belt system was defectively designed in that the seat belt webbing could and did become routed under the exposed metal portion of the seat

---

[2]    Each side filed five (5) miscellaneous pretrial motions regarding discovery issues; Plaintiff filed ten (10) motions in limine; and Defendants filed five (5) motions in limine.  On December 29, 2009, thirteen days before the commencement of the trial, Defendants filed an additional Motion in Limine To Exclude Testimony of Plaintiff's Newly Discovered Fact Witnesses and a  Motion to Compel Digital Files for Photographs, or Alternatively, for an Adverse Inference Instruction.

back recliner lever and thereby became cut, torn, and/or came apart as a result of forces upon the seat belt during the crash and overturning of the vehicle.

Defendants contended that there was no defective design of the seat belt system, that Plaintiff was not wearing his seat belt at the time of the crash, and that someone purposely cut the seat belt sometime after the accident and after the vehicle had been towed and stored in a salvage yard.

The trial proved to be no less contentious.[3]  At trial, Plaintiff was represented by attorneys J. Kendall Few from Greer, South Carolina; and Roger A. Ritchie and Michael Layman Ritchie, from the Ritchie Law Firm in Harrisonburg, Virginia.  Defendants were represented by attorneys Christopher C. Spencer and Georgia S. Hamilton, from the law firm of O'Hagan Spencer LLP in Richmond, Virginia.  The trial was bifurcated as to liability and damages.  Mr. Few was Plaintiff's lead trial counsel in the liability phase of the trial and Mr. Spencer was Defendants' lead trial counsel.

Voir dire, jury selection, and opening statements were completed on Monday, January 11, 2010.  Witness testimony commenced on January 12, 2010,  as counsel for Plaintiff began to present his case in chief.  In total, Plaintiff called six witnesses: Richard Clark, Stan Andrews (by deposition), Dr. Russell Franklin Dunn, Dr. David Alan Renfroe, Dr. Mariusz Ziejweski, and Cynthia Kay Brown. Notably, Plaintiff Ralph Raymond Brown neither testified nor was present in the Courtroom during the trial except for jury selection day.  However, the parties

---

[3]    A review of the trial transcript reveals that the Court was compelled to devote much of each trial day to ruling on objections.

had stipulated that Mr. Brown had no memory of the happening of the accident, but for leaving home and donning his seat belt to drive to Walmart.   There were no eye witnesses to the accident.

During the course of Mr. Few's presentation of Plaintiff's case-in-chief, he and his witnesses referenced and utilized a demonstrative exhibit referred to as a "buck" and which consisted of a driver's seat from a 2000 Kia Sportage automobile mounted on a wheeled platform with a left upward side mount housing a seat belt webbing and retractor device.  The buck was utilized by Plaintiff's expert witnesses to demonstrate their theory of how, during the crash, the seat belt webbing became torn, severed, and/or came apart after becoming caught under the metal portion of the seat back recliner lever which resulted in Plaintiff having been ejected from the vehicle and seriously injured during the rollover.

At one point during Mr. Spencer's cross-examination of Plaintiff's liability expert as he (Spencer) sat in the Kia seat buck with the seat belt engaged across his body and upon release and while retracting the seat belt webbing actually snagged on the edge of the plastic handle portion of the seat back recliner lever.  This revelation having occurred in front of the jury was thereafter emphasized by Mr. Few in his redirect examination of his expert witness and ensuing witnesses. This spontaneous happenstance was a dramatic moment in the trial and was potentially damaging to Defendants.

Witness testimony on behalf of Plaintiff continued through January 13 and 14. During the morning session on Friday, January 15, 2010, Plaintiff rested, whereupon counsel for Defendants moved and argued to strike the testimony of Plaintiff's liability experts and for judgment as a matter of law under Federal Rule of Civil Procedure 50.   The Court took both motions under advisement at the time.

After the luncheon recess, Defendants began their case in chief.[4]  Defendants first witness was Allan Purdham, by deposition. The second witness called at approximately 1:50 PM by Defendants was H.H. Choi, a design engineer at the KMC research and development center in South Korea.   Mr. Choi had been personally involved in the design of the seat belt restraint system in the subject model Kia vehicle.   Mr. Choi is a South Korean native and speaks very limited English. Therefore, it was necessary to utilize the services of Eun Wook Park, a Korean language interpreter, during the testimony of Mr. Choi.

After background education and employment information, Mr. Choi explained the design and testing process for the seat and seat belt restraint system used in Plaintiff's Kia Sportage vehicle.  His testimony involved technical and automotive engineering terms and described Kia's compliance with governmental and industry manufacturing and safety standards.  During defense counsel's direct examination of Mr. Choi, an unfortunate development occurred, which will be discussed at length *infra,* and which required the Court's immediate attention out of the hearing of the jury.   From approximately 2:30 PM until 4:00 PM, the trial testimony of Mr. Choi was halted as the Court and all counsel conferred and dealt with the referenced development.   At approximately 4:04 PM,  Mr. Choi was excused from the Courtroom, with the understanding that his direct and cross examination would resume at 9:00 AM on Tuesday, January 19, 2010.[5]

---

[4]     Counsel for Defendants had expressed their goal of attempting to complete the presentation of all of their witnesses by the end of that trial day.  That appeared highly unlikely to the Court.

[5]     Monday, January 18, 2010 was a federal holiday; accordingly, Court resumed trial on Tuesday, January 19, 2010.

On Tuesday, January 19, 2010, trial resumed with the continued testimony of H.H. Choi.  In total Defendants called five (5) witnesses in their case in chief: Allan Purdham, H.H. Choi, Kenneth Tandy, Dr. Thomas McNish, and John Hinger.  At the conclusion of the Defendants case in chief, at approximately 4:50 PM on January 19, 2010, with no rebuttal offered by Plaintiff,  the Court granted Defendants' motion for judgment as a matter of law finding that the Plaintiff had failed to meet his burden of proof that the subject Kia seat belt restraint system was defective and unreasonably dangerous for ordinary or foreseeable use.  On January 20, 2010, judgment was entered in favor of Defendants, Kia Motors America, Inc. and Kia Motors Corporation, and against Plaintiff, Ralph Raymond Brown.[6]

On January 21, 2010, the day after Judgment had been entered on their behalf, Defendants filed the instant motion for sanctions.

## The Relevant Events Of January 14 and 15, 2010

As noted above, Plaintiff rested on January 15, 2010.  The attorneys for Defendants were to begin their case in chief immediately upon the conclusion of Plaintiff's case.

As anticipated,  Defendants began their case at 1:30 P.M. with the calling of their first witness, Allen Purdham by deposition.  Immediately following the reading of the deposition, Defendants called  H.H. Choi as a live witness.   During his testimony, Mr. Choi was to utilize an elaborate demonstrative exhibit prepared by Defendants which was a partial vehicle buck.  The exhibit was approximately 20% of an actual 2000 Kia Sportage automobile, comprised of a driver's

---

[6]     Under Federal Rule of Appellate Procedure 4(a)(1)(A), a party is required to file a notice of appeal within thirty (30) days after the judgment or order appealed from is entered.  In this case, Plaintiff did not file a notice of appeal before the deadline expired on February 19, 2010.  Accordingly, the Judgment entered on January 20, 2010 is final.

seat, dash board, steering wheel, center console, functional driver's door within standard framework with a complete driver's seat belt restraint system housed therein.  The partial vehicle buck was on a wheeled platform and had been stored out of the view of the jury and witnesses, in an adjacent unoccupied courtroom ("Courtroom 6B").

At the conclusion of the preceding trial day on January 14, 2010, at approximately 4:30 P.M.,  Plaintiff's attorneys were granted permission by defense counsel to view and inspect the Defendant's partial vehicle buck in Courtroom 6B.[7]

At approximately 1:24 PM on Friday, January 15, 2010, Attorney Spencer, with an assistant, entered Courtroom 6B and within ten (10) minutes they were wheeling the partial vehicle buck from Courtroom 6B to the lobby area immediately outside Courtroom 6C, the trial courtroom. The partial vehicle buck, covered with shipping-type blankets, remained in the lobby area until around 2:15 PM, when Attorney Spencer wheeled it into Courtroom 6C to be used during his continuing direct examination of Mr. Choi.

---

[7]     A factual dispute exists with regard to the actual inspection.  Counsel for  Defendants insist that Attorney Few "had been asked, and had tacitly agreed, to alert defense counsel before he went to the buck so that counsel could observe."  Memo. at 1.  In his Affidavit, Attorney Few states that he was "not advised to my knowledge that this was to be a supervised inspection."  Affidavit at ¶ 3.  Nevertheless, it is undisputed and verified by hallway surveillance camera tapes (see Declaration of Robert P. Cocco, attached hereto) that Attorney Few entered Courtroom 6B alone at 5:05 PM and Defendants' Attorney Hamilton with her paralegal entered at 5:08 PM.  Attorneys Few and Michael Ritchie exited Courtroom 6B at 5:10 PM and Attorney Hamilton with her paralegal exited at 5:12 PM.  Courtroom Deputy Keirstin L. Yost locks the doors of Courtroom 6B at 5:12 PM.  There were no surveillance cameras recording activity inside of Courtroom 6B during the relevant time periods on January 14-15, 2010.  Courtroom Deputy Keirstin Yost unlocked the doors of Courtroom 6B on Friday, January 15 at 10:07 AM.  No one on the defense team inspected the partial vehicle buck at any time after Attorney Few had inspected it.

Attorney Spencer's direct examination of Mr. Choi had begun at approximately 1:50 PM.  After 20-25 minutes of direct examination of Mr. Choi, Attorney Spencer and his assistant wheeled the partial vehicle buck into the Courtroom and parked it with the driver's door directly in front of the jury box.  After the buck was in position, Attorney Spencer had Mr. Choi step down from the witness stand and he stood between the buck and the jury box.  Attorney Spencer then questioned Mr. Choi for 5-10 minutes or so regarding the authenticity of the buck as being an accurate replica of the driver's interior of a 2000 Kia Sportage and having him explain the schematic drawings of the seat belt restraint system, which were displayed on a tripod before the jury.

Attorney Spencer then asked Mr. Choi to explain European Fitting Standards to the jury and offered him to use the partial vehicle buck if he needed to while answering.  Mr. Choi opened the door and got into the driver's seat of the vehicle buck.  Attorney Spencer then walked around the open door, observed the interior of the vehicle buck and immediately asked Mr. Choi to get back out of the buck, closed the door and loudly announced that he had a motion to present and requested a side bar.  At side bar with all counsel, the Court was advised by Attorney Spencer that someone had "tampered" with the vehicle buck as the driver's seat belt webbing was not in its normal fully retracted position, but rather had been routed behind / under the seat back recliner lever (a position consistent with Plaintiff's liability theory of the case) and was clearly observable to the jury with the vehicle buck door open.

The jury was excused from the courtroom so that the Court and parties and their counsel could attempt to ascertain what had happened and what to do about it.[8]  In response to the implied accusation from defense counsel, Mr. Few denied five (5) times that he had routed the seat belt webbing behind the seat recliner handle.[9]  At one point, Mr. Few suggested that perhaps defense counsel had tampered with the evidence:

> **MR.  FEW**: I know that they have, and as is consistent with what I have seen, that Mr. Spencer and his reputation I know he has to abuse counsel - - and maybe that's what they've done in this case.  I don't know.  But I didn't do it.

Transcript at 11, Line 4 - 8.

With the assent of all counsel, the Court brought the jurors back into the Courtroom, one at a time, and individually voir dired each juror as to what, if anything, that juror observed when Mr. Choi got into the vehicle buck.   During this individual voir dire, it was discovered that two jurors had observed that the seat belt was tucked behind the seat back recliner lever.  It was also disclosed that one of these jurors had told his fellow jurors what he had seen.  It became apparent that this anomaly had been discussed among at least some of the jurors during the recess.

Upon the completion of the individual juror voir dire and after discussion and agreement of counsel, the eight member jury panel was returned to the Courtroom and seated, whereupon the Court delivered a cautionary instruction to the jurors as follows:

---

[8]    During a recess the Court contacted Robert P. Cocco, Judicial Security Inspector with the U.S. Marshals Service and explained the situation which had arisen.  The Court requested that Mr. Cocco immediately begin to review any camera surveillance tapes of Courtroom 6B in an attempt to determine who had access to Courtroom 6B and vicinity on January 14 - 15, 2010.  *See* Declaration of Robert P. Cocco, attached hereto.

[9]    See Transcript of Proceedings, Late Afternoon Session, January 15, 2010 at Page 6, Line 16; Page 6, Line 18; Page 8, Line 14; Page 10, Line 10; and Page 11, Line 24.

Ladies and gentlemen of the jury, as I'm sure you have gleaned this afternoon, we had an unfortunate event develop with respect to this particular exhibit.  And I don't know that it - - it developed to our attention this afternoon.  I don't know when, how, or under what circumstances it did develop.  This was being stored in an adjacent courtroom and it has been inspected by lawyers and parties of each team as late as last night and some today.

You know what has occurred.  It is, unquestionably, an unconscionable act by whomever did it.  And if I ever find out who did it, there will be hell to pay and serious consequences, because that is illegal.  It is immoral.  It is wrong.  And it has no place in a Court of law.

And I'm instructing you to ignore the existence of that fact because some wrongdoer put it there, obviously, with the intention to influence you, or, to cause this trial to end because of that prejudicial act.  You understand that?

I know you do.  It's wrong.  And I have already alerted the United States Marshal's Office, who is in charge of security in this building, to do an investigation to attempt to ascertain how, when, how, and when that happened. I can fill in the why, but I can't fill in the how and the when.

After having talked to you individually and talked to the lawyers, and we feel reasonably confident that you can remain being as fair and impartial in this case as you promised you would be on day one.  And we've already invested four days into testimony and evidence.  And although it feels like two weeks, it's only been four days.  There was a hope to try to wrap up the evidence and testimony today, as that's why I asked you to come at eight o'clock in the morning.  And it didn't work out that way and it didn't work out that way for a lot of legitimate, legal disputes that had to be dealt with.  And they have been dealt with and we were about to move on until we were interrupted by this incident.

So, I'm going to ask you to just, as I said, please put it out of your mind.  I will make it a priority of mine to try to find out how it happened.  Whether I can or not, I don't know.  But I'm going to try because it infuriates me.  And, so, we're going to not bring Mr. Choi back in at four minutes after four.  And even though Mr. Choi has a flight to Korea at 6:30 tonight, I'm - - we're imposing on Mr. Spencer to impose on his client to keep him here until Tuesday.

> And, so, we're going to adjourn for the weekend. I hope you
> enjoy a good night's sleep tonight, tomorrow, Sunday, and Monday,
> and be ready to come back and start at nine o'clock, our normal time,
> on Tuesday morning. . . .
>
> . . .
>
> So, thank you very much for your attention today.  I'm sorry
> for the delay that has occurred, but it's just part of a process that
> happens at times, especially in view of what's happened today, with a
> little heightened concern with untoward events. . . .

Whereupon the jury was excused for the weekend.  *See* Transcript at 54-57.

After the jury was excused, Attorney Few asked if he could make a statement to the

Court, which request was granted.  It was in this statement that Attorney Few first informed the

Court that he had in fact checked the seat recliner handle and slid the seat belt behind the recliner

handle. The following is Attorney Few's statement, in pertinent part:

> **MR. FEW:** Last evening, I went down and looked at the buck.
> Inspected it to see whether or not it was the right vehicle identification
> number.  I checked the recliner handle.  I slid the belt behind the
> recliner handle.  It's my belief and my recollection that I pulled it back
> out at that time.
>
> I certainly have not done anything deliberate to and didn't
> realize that this thing was going to turn out this way.  And it wasn't
> my intent, if for some reason I didn't pull it back out, that this
> happened this way.  I mean, I was doing - - I went down there and
> looked at it to see whether or not it was a valid exhibit.  And it is my
> firm belief, and I'm willing to get - - I mean, here on the witness stand
> and have people cross-examine me if they want to.  But that's what I
> did.

Transcript at 58, Lines 4 - 18.

> **MR. FEW:** These two ladies [part of defense team] came in [to
> Courtroom 6B] as I was getting ready to put the covering back on it as
> it was when I had, had gone in. I had looked at the buck, as I'm
> required to do.  I looked at the vehicle identification number.  I

noticed that it was not the appropriate model year.  I wrote out the vehicle identification number on the buck on this sheet of paper.  I came - - and then I looked at the other components of it.  I had opened the door to look at the seat back recliner lever.  I had taken the belt to see whether it would slide under there the same way this one does.  And it's my belief and my recollection that I pulled it back out and that it was out when I left.

I certainly wasn't intending that it would be brought down - because I thought it was out.  I didn't think that I was leaving it that way, if I left it that way.

. . .

I'm seventy years old and I'd been through a fairly hard day.  I went down there and I don't remember everything as good as I did when I was twenty-five or thirty.  But I certainly have never in my career ever tried to do anything that is inappropriate in any case that I, that I've handled. . . .

. . .

And then what just happened, my position, all of a sudden, here in front of God, and the world, and the jury, and everything else, somebody all of a sudden accuses you of something and my first reaction is, wait a minute.  I didn't do that.  And I still believe that to be true.  I don't' think that I left it behind the seat back recliner lever.  I certainly didn't mean too.

. . .

Transcript at 59 - 62.

## Standard of Review

Title 28, United States Code, section 1927 provides as follows:

§ 1927.  Counsel's liability for excessive costs

Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiples the proceedings in any case

12

unreasonably and vexatiously[10] may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927.  The statute thus limits attorney sanctions imposed thereunder to those situations where an attorney has: (i) multiplied proceedings; (ii) unreasonably and vexatiously; (iii) thereby increasing the cost of the proceedings; (iv) with bad faith or with intentional misconduct.  *In re Schaefer Salt Recovery Inc.*, 542 F.3d 90, 101 (3d Cir. 2008) (quoting  *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 278 F.3d 175, 188 (3d Cir. 2002)).

The United States Court of Appeals for the Third Circuit has clarified that "[s]anctions may not be imposed under § 1927 absent a finding that counsel's conduct resulted from bad faith, rather than misunderstanding, bad judgment or well-intentioned zeal." *LaSalle Nat'l Bank v. First Connecticut Holding Group, L.L.C.*, 287 F.3d 279, 289 (3d Cir. 2002) (citations omitted).  It has further stated that " '[c]ourts should exercise [this sanctioning power] only in instances of a serious and studied disregard for the orderly process of justice.' "  *Id.* at 288-89 (quoting *Ford v. Temple Hosp.*, 790 F.2d 342, 347 (3d Cir. 1986)).  In other words, the conduct giving rise to sanctions  " 'must be of an egregious nature, stamped by bad faith that is violative of recognized standards in the conduct of litigation.' "  *Id.* at 289 (quoting *Baker Indus. Inc. v. Cerberus, Ltd.*, 764 F.2d 204, 208 (3d Cir.1985)).  This is to ensure that the statute's application does not " 'stifle the

---

[10]    The term "vexatious" is not defined in the statute.  In such circumstances, courts typically read statutory terms to convey their ordinary meaning.  *See Buckhannon Bd. & Care Home, Inc. v. West Virginia Dep't of Health & Human Servs.*, 532 U.S. 598 (2001).  Black's Law Dictionary defines "vexatious" as conduct "without reasonable or probable cause or excuse; harassing; annoying."  Black's Law Dictionary 1701 (9th Ed. 2009)

enthusiasm or chill the creativity that is the very lifeblood of the law.' " *Id.* (quoting *Mone v. Comm'r of Internal Revenue*, 774 F.2d 570, 574 (2d Cir. 1985)).

The sanctions that may be imposed under § 1927 are limited to <u>excess</u> costs and expenses that are incurred "because of such conduct." 28 U.S.C. § 1927.

The decision whether to grant or deny attorneys' fees under § 1927 is within the discretion of the district court. *See In re Orthopedic Bone Screw Prods.,* 193 F.3d 781, 795 (3d Cir. 1999); *LaSalle Nat'l Bank*, 287 F.3d at 288.

## Discussion

Defendants argue that they are entitled to an award of fees and costs pursuant to 28 U.S.C. § 1927 because Attorney Few acted in bad faith.[11] As stated *supra*, before an award of fees and expenses can be awarded under § 1927, the court must find willful bad faith on the part of the offending attorney. *See Baker Indus., Inc. v. Cerberus Ltd.*, 764 F.2d 204, 208 (3d Cir. 1985). Section 1927 is reserved for behavior of an egregious nature that is violative of recognized standards in the conduct of litigation. *See In re Prudential,* 278 F.3d at 189-90.

Distilled to its essence, Defendants' argument is that the discovery of the seatbelt webbing behind the seat back recliner lever in front of the jury on the afternoon of January 15, 2010, delayed significantly their presentation of the case. Defendants contend that Mr. Choi, who was

---

[11] The United States Court of Appeals for the Third Circuit has held that due process requires that "[p]rior to sanctioning an attorney, a court must provide the party to be sanctioned with notice and some opportunity to respond to the charges." *Jones v. Pittsburgh Nat. Corp*., 899 F.2d 1350, 1357 (3d Cir. 1990). Here, Attorney Few had adequate notice of a potential sanction under 28 U.S.C. § 1927 and argued against the imposition of any sanction in his Affidavit and response brief. *See* Document Nos. 296, 297 and 298.   Moreover, because no sanction will be imposed, the necessity for a hearing has been obviated.

scheduled to return to Korea on the evening of January 15, 2010, was required to remain in Pittsburgh throughout a long holiday weekend in order to resume his testimony on Tuesday, January 19, 2010.  Defendants also contend that two of their witnesses, Kenneth Tandy and Dr. Thomas McNish, would have testified on Friday, January 15, 2010, but for this incident.   Not surprisingly, Attorney Few, individually and through his own counsel, vehemently denies that he acted in bad faith or that Defendants incurred excess costs, expenses and attorneys' fees as a result of the discovery of the seat belt webbing behind the seat back recliner lever.

The United States Court of Appeals for the Third Circuit has instructed that to impose sanctions under § 1927, the district court must make findings that the sanctioned attorney's action or conduct demonstrated willful bad faith.  *Baker Indust. v. Cereberus Ltd.,* 764 F.2d 204, 208 (3d Cir. 1985).  Therefore, the first determination that the Court must decide is whether the challenged actions of Attorney Few constituted willful bad faith.  In making this determination, the district court is entitled to rely on the totality of the circumstances."  *Prudential Insurance v. America Sales Practice*, 278 F.3d 175, 188 (3d Cir. 2002).

The attorney's "conduct must be of an egregious nature, stamped by bad faith that is violative of recognized standards in the conduct of litigation."  *Hackman v. Valley Fair*, 932 F.2d 239, 242 (3d Cir. 1991).  However, "courts should exercise [sanctions] only in instances of a serious and studied disregard for the orderly process of justice."  *Ford v. Temple Hospital,* 790 F.2d 342, 346-47 (3d Cir. 1986).  Decisions of our appellate court have consistently held that the bad faith requirement is a necessary predicate under § 1927, although it is not explicitly stated in the statute. *Baker Indust.*, 764 F.2d at 208.

Undeniably, this is a very close call.  However, after careful deliberation, and despite Defendants' urging, the Court cannot conclude that Attorney Few acted with willful bad faith, rather than perhaps "negligence, inadvertence or incompetence."  *Northwest Bypass Group v. U.S. Army Corps of Engineers*, 552 F. Supp.2d 137, 144 (D.N.H. 2008).

Defendants rely heavily on a Memorandum Opinion issued by a former respected jurist of this district, *Derzack v. County of Allegheny*, 173 F.R.D. 400, 403 (W.D. Pa. 1996).  In *Derzack*, the district court awarded sanctions upon a finding that there was "no question" that the plaintiffs had "committed a flagrant fraud on the court by manipulating evidence submitted in answers to interrogatories to support their now-withdrawn business loss claim."  *Id.* at 403.  Unlike the situation at bar, the court in *Derzack* was faced with a circumstance in which the actions of Plaintiffs had involved "a series of deceitful, fraudulent acts undertaken in bad faith."  *Id*. at 402.

In the case *sub judice,* the conduct in question was not repeated misconduct, but rather a single unexplainable and unfortunate occurrence.  Further, in  *Derzack*, the court found by clear and convincing evidence that Plaintiffs had unquestionably engaged in "fraud on the court."

After scouring the record and based upon the Court's own notes and recollection of the events of January 15, 2010, the Court is simply unable to conclude that Attorney Few acted with purposeful bad faith or with intentional misconduct or committed a "fraud on the court."  By Attorney Few's own admissions, he inspected the partial vehicle buck after a "fairly hard day."  The surveillance tape reflects that Mr. Few was alone with the buck in Courtroom 6B for a total of three (3) minutes before defense counsel joined him in Courtroom 6B.  Plaintiff's co-counsel entered the courtroom approximately five (5) minutes after Attorney Few had gone in and together they walked out of Courtroom 6B within a  minute later.  *See* Declaration of Robert P. Cocco.

16

The underlying explanation for his challenged actions as advanced by Attorney Few are not unreasonable.  While some may question his proffered explanation as suspect, the Court cannot find that Attorney Few's conduct was completely unreasonable or vexatious.  For this same reason, the Court finds no conclusive evidence of bad faith or intentional misconduct.

However, assuming *arguendo*, that Attorney Few had been found to have acted in "bad faith," the Court would still not award monetary sanctions under § 1927 because Defendants have failed to demonstrate that they actually incurred <u>excess</u> costs, expenses and attorneys' fees as a result of Attorney Few's conduct.  The <u>only</u> type of sanction permissible under § 1927 is "the <u>excess</u> costs, expenses and attorneys' fees reasonably incurred because of such [sanctionable] conduct."  28 U.S.C. § 1927 (emphasis added).

Mr. Choi was in the early stage of his highly pertinent direct examination at the time of the incident.  The Court would have taken a fifteen to twenty minute mid-afternoon recess, so realistically it is unlikely that Mr. Choi's cross examination, redirect and recross examination(s) would  have been completed by the end of the trial day.  Generally, the Court recesses for the day no later than at 4:30 PM.

The trial resumed on Tuesday, January 19, with the continued direct examination of Mr. Choi, who took the stand at approximately 9:00 AM.  Mr. Choi's testimony, including cross examination and re-direct, lasted until 10:45 AM.  Thus, Mr. Choi (including the time he testified on Friday, January 15 and the continuation of his testimony on Tuesday, January 19) testified for approximately two hours and fifteen minutes overall.   Based on these estimations, Defendants argue that Mr. Choi would have completed his testimony on Friday afternoon.

However, the Court is not convinced that Mr. Choi's testimony in fact would have been completed on Friday.  Typically, the Court provides the jurors with a mid-afternoon break of approximately 15 - 20 minutes duration and the Court typically recesses for the day at 4:30 PM. However, on that particular Friday, the Court commenced trial at 8:00 AM and it was a holiday weekend, so it is not unlikely that Court would have also recessed at an earlier time that day.  Also, there is no way of knowing how long Mr. Choi's cross examination would have taken if it had started on Friday without the intervening event, and no way of knowing if redirect and recross examination would have been needed or not.

Therefore, the Court finds that even with the best efforts of all counsel, the possibility exists that Mr. Choi's testimony would not have concluded on Friday, January 15, and he, therefore, would have been required to continue his trial testimony on Tuesday, January 19, as he ultimately did.

Furthermore, the transcript reflects that Kenneth Tandy testified a total of 40 minutes, beginning at 11:10 AM and concluding at 11:50.  The direct examination of Dr. Thomas McNish began at 11:55 AM and his cross examination commenced at 2:23 PM and ended at 3:07 PM.  Accordingly, even had Mr. Choi's testimony been concluded on Friday, January 15, it would certainly have been too late in the day for either Kenneth Tandy and/or Dr. Thomas McNish to have taken the stand.  Without question, it would have been necessary for these witnesses to return to Pittsburgh on Tuesday, January 19.

For these reasons, the Court cannot find that the conduct of Attorney Few, even if found to be have been in bad faith, resulted in excess costs, expenses and attorneys' fees for the Defendants.

**Conclusion**

For all of the foregoing reasons, the Motion for Sanctions will be denied.  An appropriate Order follows.

McVerry, J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| RALPH RAYMOND BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 02: 06-cv-0804 |
| | ) | |
| | ) | |
| KIA MOTORS CORPORATION and | ) | |
| KIA MOTORS AMERICA, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER OF COURT**

AND NOW, this 17th day of March, 2010, in accordance with the foregoing

Memorandum Opinion, it is hereby ORDERED, ADJUDGED AND DECREED that the

Defendants' Motion for Sanctions is **DENIED.**


BY THE COURT:

s/Terrence F. McVerry
United States District Court Judge

cc:       Mark F. Conboy, Esquire
Conboy & Associates LLC
Email: conboymark@hotmail.com

J. Kendall Few, Esquire
Email: kelli@jkendallfew.com

Michael Layman Ritchie, Esquire
Ritchie Law Firm
Email: MRitchie@Ritchielawfirm.com

Roger A Ritchie, Esquire
Ritchie Law Firm
Email: rritchie@ritchielawfirm.com

Christopher C. Spencer, Esquire
O'Hagan Spencer, LLP
Email: cspencer@ohaganspencer.com

Clem C. Trischler, Esquire
Pietragallo, Bosick & Gordon
Email: cct@pietragallo.com

Georgia S. Hamilton, Esquire
O'Hagan Spencer LLP
Email: ghamilton@ohaganspencer.com

Elizabeth Kinland Shoenfeld, Esquire
O'Hagan Spencer, LLC
Email: ekinland@ohaganspencer.com

Scott W. Monson, Esquire
Gordon & Rees, LLP
Email: smonson@gordonrees.com